**Bobbie THORNTON, Plaintiff,**

v.

**SOUTH CENTRAL BELL TELEPHONE COMPANY, Defendant.**

**Civ. A. No. 3:93–cv–166WS.**

United States District Court,
S.D. Mississippi,
Jackson Division.

Aug. 31, 1995.

Firnist J. Alexander, Jr., Jackson, MS, Louise Harrell, Jackson, MS, for plaintiff.

John M. McCullouch, Bellsouth Telecommunications, Jackson, MS, William T. Siler, Jr., Phelps Dunbar, Jackson, MS, Benjamin A. Hardy, Jr., Bellsouth Telecommunications, Inc., Birmingham, AL, Edward L. Rankin, Bellsouth Telecommunications, Atlanta, GA, for defendant.

## MEMORANDUM OPINION AND ORDER

WINGATE, District Judge.

Before the court is the motion of the defendant South Central Bell Telephone Company for summary judgment pursuant to Rule 56(b),[1] Federal Rules of Civil Procedure. In this employment discrimination action, plaintiff Bobbie Thornton, a black, female, former employee of defendant's, alleges that defendant violated Title VII of the Civil Rights Act of 1964, Title 42 U.S.C. § 2000e,[2] et seq., by allowing its supervisors

---

1. Rule 56(b) of the Federal Rules of Civil Procedure provides:

   (b) For Defending Party. A party against whom a claim, counterclaim or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof.

2. Title 42 U.S.C. § 2000e–2(a) provides:

   It shall be an unlawful employment practice for an employer—

   (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

   (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

to discriminate against plaintiff on account of her race and to harass plaintiff because of this same racial animus so frequently and viciously that plaintiff became mentally ill and was forced to retire with a disability pension. Defendant denies the charge, asserting that plaintiff is bereft of any credible facts to support her claim. In addition, defendant claims that since plaintiff's complaint was filed two years and seven months after the expiration of the 90–day period established by Title VII for filing a civil action such as this, plaintiff's complaint should be dismissed. Both of these points are raised and argued in defendant's motion for summary judgment. This opinion, however, addresses only the latter argument: whether plaintiff timely filed her complaint within Title VII's 90–day limitation period which begins when the aggrieved person is given notice by the Equal Employment Opportunity Commission ("EEOC") (the agency before whom plaintiff must file an initial charge of discrimination) that the EEOC has completed its investigation and dismissed the charge. Plaintiff here admits that this lawsuit was filed two years and seven months after the expiration of the 90–day period. Plaintiff, however, contends that she never received a Determination Letter (also referred to as a "right-to-sue" letter) and, further, that because of her mental illness at the time when the EEOC purportedly issued a Determination Letter she could not have appreciated the significance of the letter even had it been placed in her hands. So, in opposition to defendant's motion for summary judgment relative to Title VII's 90–day limitation period, plaintiff claims non-receipt of the EEOC Determination Letter and, alternatively, equitable tolling warranted by her alleged mental instability. Unpersuaded by either of these arguments, this court finds that plaintiff has failed to show legal justification for not timely filing this lawsuit within the 90–day limitation period. Accordingly, for the reasons which follow, this court dismisses plaintiff's lawsuit with prejudice.

### EVIDENTIARY HEARING

In support of its motion for summary judgment, the defendant dutifully submitted affidavits, documents and excerpts of deposition testimony. So did the plaintiff. Still, after studying these materials, the court felt that it needed more, especially the in-court testimony of the plaintiff, her husband and her physician. Hence, the court ordered the parties to attend an evidentiary hearing. Of course, bountiful case law supports this course of action. See Clark v. Tarrant County, 798 F.2d 736 (5th Cir.1986) (in sex discrimination case, two-day evidentiary hearing held to determine, inter alia, whether the county was an employer under the state statute); Cupit v. Jones, 835 F.2d 82 (5th Cir. 1987) (section 1983 civil rights action, an evidentiary hearing was held to supplement the affidavits and exhibits pursuant to a summary judgment motion); and Neely v. City of Grenada, 799 F.2d 203, 208 n. 5 (5th Cir. 1986) (evidentiary hearing was held to determine whether city was complying with its affirmative action plan).

Both sides were allowed to call witnesses. The court's only limitation was that all testimony be restricted solely to the issue at hand. Plaintiff called herself and 2 other witnesses: Sharon Desselle and Jessie Thornton. The defendant called Dr. Barbara Unger Goff. At the conclusion of the hearing, the court requested proposed findings of law and fact from the parties.

### FACTS

Plaintiff Bobbie Thornton, a black female, undertook employment for the defendant as a mail clerk on September 19, 1972. Thereafter, over the years she served in various other clerk positions. On or about January 12, 1990, plaintiff allegedly suffered a mental breakdown. She claims the mental breakdown was caused by race discrimination and harassment heaped upon her by her white supervisors from 1986–1990. While defendant vigorously disputes the cause of the mental breakdown, defendant acknowledges that one of its consequences caused plaintiff's hospitalization in the psychiatric ward of St. Dominic's Hospital in Jackson, Mississippi, from January 12, 1990, through March 2, 1990, and again on May 1, 1990, through June 14, 1990. Plaintiff never returned to work after her May, 1990, hospitalization because her psychiatrist, Dr. Barbara Goff,

opined (in agreement with the defendant's Benefits Office) that plaintiff was disabled from all work due to her depression. After she had exhausted her short term disability benefits available to her as an active employee, she applied for and was granted a disability pension in February, 1991.

During her periods of hospitalization, plaintiff was nursed principally by her daughter, Sharon Desselle, who lived with plaintiff off and on from late 1989 through 1991, and by her sister, Hazel Brown, who resided at plaintiff's home in May of 1990. Plaintiff and her husband, Jessie Thornton, were separated at the time and plaintiff's husband was not residing at the same address with her.

Prior to her departure from defendant's employment and soon after plaintiff's mental breakdown, on or about January 25, 1990, plaintiff had filed a charge of race discrimination against the defendant with the EEOC. The charge alleged the following:

I. I am being subjected to adverse and different terms and conditions of employment. I am employed as [sic] clerk and have worked for this employer since September 19, 1972.

II. My appeals to higher management about the treatment afforded me by my white female supervisor has [sic] not produced favorable results.

III. I believe that I am being discriminated against and treated in this manner because of my race, black, inasmuch as:

A. My duties as relieving supervisor were taken and given to a white with less experience and education.

B. This white co-worker is given better rating than I am although he is not as proficient in performing the duties of the job.

C. I am harassed by the supervisor and required to perform duties that white employees are not required to perform.

According to plaintiff, this charge was prepared and dated by her husband based upon information she had given to him before her mental breakdown. Plaintiff's husband was familiar with such matters because he was a former "EEO officer" for his employer. Plaintiff acknowledges signing the form, but claims she did not read it because of her mental condition. Later, however, when the charge form was read aloud to her by an EEOC official, she confirmed the accuracy of the charge.

Pursuant to its statutory directive, the EEOC investigated the charge, but found no facts sufficient to credit plaintiff's claims. In its Determination Letter dated May 23, 1990, Henrene Matthews, Area Director, wrote on behalf of the EEOC that: (1) plaintiff had not performed duties of a relief supervisor since she entered the General Clerk job title on August 10, 1986; (2) plaintiff's male comparators did not receive better ratings than plaintiff; and (3) plaintiff had not been racially harassed by her supervisor. The Determination Letter further informed plaintiff that if she desired an internal EEOC review of the determination, she must request that review by June 6, 1990, or else the determination would become final on the following day (June 7) and the charge dismissed. The Determination Letter concluded:

FOLLOWING DISMISSAL, THE CHARGING PARTY MAY ONLY PURSUE THIS MATTER FURTHER BY FILING SUIT AGAINST THE RESPONDENT(S) NAMED IN THE CHARGE IN FEDERAL DISTRICT COURT WITHIN 90 DAYS OF THE EFFECTIVE DATE OF DISMISSAL. Therefore, in the event a request for review is not made, if a suit is not filed by September 4, 1990, the Charging Party's right to sue will be lost.

The EEOC Determination Letter, also referred to as a "right-to-sue" letter, was mailed to plaintiff's home address and to South Central Bell. South Central Bell received the letter on May 24, 1990. Plaintiff, who was hospitalized at the time, says she never saw the letter. Plaintiff's sister, Hazel Brown, who was residing at plaintiff's home, says she, too, never saw the letter. However, plaintiff's husband, Jessie Thornton, testified at the evidentiary hearing that plaintiff showed him the Determination Letter, although he was not sure when. He testified

that plaintiff also told him that Attorney Elizabeth Gilchrist would take her case.

Plaintiff says that even if she had seen the Determination Letter that her mental condition would have robbed her of its significance. As the following facts show, plaintiff both received the Determination Letter as indicated by her husband's testimony and understood its import.

During her hospitalization from January 12 through March 2, 1990, plaintiff told Dr. Goff that her emotional problems had been caused by a "racial issue" at work. She stated that she had trained a white male to do her job and that thereafter she had been demoted to a job of lesser status in her department. She stated that she had attempted to contact her union about the situation.

During this same hospitalization, plaintiff engaged in group therapy wherein she discussed with other patients her concerns and frustrations related to this alleged discriminatory treatment by her supervisor. Dr. Goff referred plaintiff to another psychiatrist in September, 1990, for a second opinion. During her consultation with this psychiatrist, a Dr. Holloman, plaintiff told him that problems with her supervisor had begun five or six years earlier, and she related complaints about the supervisor's treatment of her similar to the ones she had related to Dr. Goff.

Plaintiff's daughter, Sharon Desselle, lived with plaintiff from late 1989 through 1991. Ms. Desselle accompanied her mother on three trips to visit Attorney Gilchrist to discuss plaintiff's discrimination claim. During the first meeting,[3] plaintiff told Attorney Gilchrist that plaintiff had trained a supervisor who then was placed over plaintiff. She also told Attorney Gilchrist that this supervisor would select other employees, instead of plaintiff, to serve as the relieving supervisor. Plaintiff herself remembered that first meeting with Attorney Gilchrist and remembered Gilchrist stating that she would look into the matter. On their second visit, Attorney Gilchrist was not in the office when Ms. Desselle and her mother arrived for an appointment. Ms. Desselle could not remember the date of the third meeting with Attorney Gilchrist, but did remember that Attorney Gilchrist agreed to take plaintiff's case at that time and told them that they would have to pay no money up front.

After this visit, plaintiff was accompanied on subsequent visits to Attorney Gilchrist's office by one of her two sisters, Linda Redd or Hazel Brown. Plaintiff recalls these visits occurring during 1990.

In addition to drafting the charge of discrimination for filing with the EEOC, plaintiff's husband also accompanied plaintiff on one visit to the EEOC after filing the charge. Moreover, Mr. Thornton also prepared a summary of the plaintiff's complaints about workplace discrimination and gave it to plaintiff so that plaintiff could give it to her attorney, Attorney Gilchrist. Plaintiff confirmed that her sister Hazel Brown had provided Attorney Gilchrist with an "outline of what happened to me from my husband." As earlier mentioned, plaintiff's husband was an "EEO officer" for his employer for four years prior to his assisting his wife with the filing of her charge of discrimination with the EEOC. In April, 1990, plaintiff told her psychiatrist, Dr. Barbara Goff, that the EEOC had given her permission to sue South Central Bell. Moreover, in April, 1990, plaintiff told her psychiatrist that she had spoken to Attorney Elizabeth Gilchrist regarding her EEOC claim. The EEOC issued its Determination Letter on May 23, 1990; however, the record is unclear whether the EEOC informally communicated its findings to plaintiff or her attorney before that date.

In July, 1990, plaintiff told Dr. Goff that Attorney Gilchrist would file her lawsuit as soon as the Mississippi Legislature acted favorably on a bill concerning awardable damages in civil actions. In November, 1990, plaintiff told Dr. Goff that she had recently spoken with Attorney Gilchrist.

On September 6, 1991, plaintiff told Dr. Goff that she had recently seen Attorney Gilchrist.

---

**3.** The date of the meeting is uncertain. Attorney Gilchrist did not testify at the hearing. Ms. Des- selle simply recalls that it occurred prior to September 8, 1990.

In October, 1991, she told Dr. Goff that she had heard nothing from South Central Bell or Attorney Gilchrist.

By December, 1991, plaintiff had told Dr. Goff that there was a legal action pending against South Central Bell regarding her discrimination claim and that she was unwilling to undergo electroshock therapy for fear that it would have an effect on her memory. Plaintiff subsequently underwent electroshock therapy on eight occasions.

By March, 1992, plaintiff had told Dr. Goff that her attorney believed that a hearing would take place within the next few months.

On March 16, 1992, plaintiff told Dr. Goff that she had recently met another woman who understood how plaintiff felt, because that woman had told plaintiff that she had been harassed on her job as well. Plaintiff also told Dr. Goff that in a local grocery store she had met a South Central female employee who allegedly stated that she, too, had experienced some of the same problems that plaintiff had experienced with respect to harassment at work and was now trying to retire.

On March 26, 1992, plaintiff told Dr. Goff that she had learned from her attorney's secretary that the trial of her discrimination claim would occur in September, 1992.

On June 3, 1992, plaintiff told Dr. Goff that her daughter Sharon and her sister Hazel knew the majority of the workplace events that had caused her to have emotional problems. On that same date, she expressed concern that neither she nor Dr. Goff had been able to reach Attorney Gilchrist to discuss the status of her legal action.

Plaintiff recalled a meeting in June, 1992, with Dr. Goff in which she expressed the following concern regarding Attorney Gilchrist's representation of her. She was critical of Attorney Gilchrist:

> because I hadn't been able to reach her [Attorney Gilchrist] and I wanted to reach her to see what was wrong. My sister had tried to reach her and we was [sic] getting no type of response. And I just told her

we was [sic] getting no type of response from Attorney Gilchrist's office and it was upsetting me, because I couldn't hear nothing from her; because I had been did [sic] wrong one time by the system, and I didn't know whether I was being done wrong by the system.

Tr. 20–21.

On July 5, 1992, plaintiff told Dr. Goff that she had spoken to Attorney Gilchrist and that South Central Bell wanted to settle out of court.

On July 9, 1992, Dr. Goff wrote Attorney Gilchrist to tell her that plaintiff had become "increasingly anxious and depressed as postponements have occurred with respect to her legal interaction with South Central Bell."

On August 10, 1992, plaintiff told Dr. Goff that she had recently seen Attorney Gilchrist and that Attorney Gilchrist was demanding $10.5 million in damages from South Central Bell. Dr. Goff's notes reflect that although anxious at the beginning of the interview, the plaintiff began to "recover as she got into recounting some things that she had gone over with her attorney." On the same date, plaintiff told Dr. Goff more details about her discrimination claim.

On August 28, 1992, plaintiff told Dr. Goff that she was upset because she had attempted to reach her attorney to discuss a potential settlement and she had received an answering machine when she called. She told Dr. Goff that she had left a message for her attorney to call her back. She further told her doctor that she understood that her attorney was running for a political office.[4]

On August 31, 1992, plaintiff told Dr. Goff that she still had not heard from her attorney, but was "taking this in stride."

On September 8, 1992, plaintiff told Dr. Goff that she had seen her attorney the day before, that the defendant had offered a $10,-000.00 settlement of her lawsuit, and that the case would go to court if it did not settle for that price. Plaintiff also recalls Attorney Gilchrist telling her that South Central Bell

---

4. Attorney Elizabeth Gilchrist did indeed seek public office at the time. She ran for, but lost a bid for the United States House of Representatives, Fourth Congressional District, as an independent candidate. The general election was held November 3, 1992.

"wanted to settle ... for $10,000.00, but she [Attorney Gilchrist] was going to start at ten million dollars."

On October 19, 1992, plaintiff told Dr. Goff that Attorney Gilchrist had someone in her law office assisting her and that plaintiff anticipated that the attorney would be able to "manage something soon." On November 11, 1992, she told Dr. Goff that she had an appointment with her attorney for November 19.

In the opinion of Dr. Goff, during the period April through November, 1990, plaintiff had the requisite mental capacity to form a belief that she was a victim of race discrimination; that plaintiff had in fact formulated such a belief; that she had the mental capacity to articulate that belief to others; that she had articulated that belief to Dr. Goff, Dr. Holloman, group therapy patients, her sisters, her daughter, and her husband; that she had the capacity to express a desire for a legal remedy for the perceived discrimination; and that she had in fact expressed that desire to Dr. Goff.

Indeed, the plaintiff testified during the evidentiary hearing into this matter and this court's assessment of her mental bearing is the same. While she had difficulty talking, having to measure and squeeze out her words, the content of her speech was logical and responsive. She remembered names, dates and, above all, the background facts of the alleged discriminatory treatment accorded her by defendant.

As earlier stated, plaintiff did not file suit by September 4, 1990, the date stated in the Determination Letter. Her complaint was not filed until April 6, 1993, two years and seven months later. Plaintiff admits retaining an attorney, Elizabeth Gilchrist, sometime in 1990 to file suit against the defendant. As time progressed, however, Ms. Gilchrist began missing appointments, and plaintiff ultimately discovered in late 1992 that Ms. Gilchrist had not filed suit and was no longer practicing law. Although Ms. Gilchrist did not file suit, prior to the date plaintiff dismissed her, Ms. Gilchrist had prepared a complaint to be filed at some point. Plaintiff thereafter retained a second attorney, Firnist Alexander, who on April 6, 1993,

filed the instant action using the Gilchrist-drafted complaint, before he, too, was fired by plaintiff. Plaintiff then retained her current attorney, Louise Harrell, who served the Gilchrist-drafted complaint filed by Mr. Alexander. Ms. Harrell continues to represent plaintiff.

### ANALYSIS

■ Title VII of the Civil Rights Act of 1964 requires an aggrieved person whose charge of discrimination has been dismissed by the EEOC to bring a civil action within 90 days after being given notice of the dismissal or else lose the right to sue. 42 U.S.C. § 2000e–5(f)(1). The Fifth Circuit has held that "the timely filing requirements of Title VII are to be treated as limitations periods for all purposes." *Nilsen v. City of Moss Point,* 701 F.2d 556, 562 (5th Cir.1983) (*en banc* ); *see also Campbell v. Jackson Business Forms Co.,* 841 F.Supp. 772, 773 (S.D.Miss.1994). When a defendant contends that a plaintiff has failed to file suit timely under Title VII, the burden rests with the plaintiff to prove this condition precedent by showing either that the suit, in fact, was filed timely or that the deadline should be subject to the equitable doctrines of estoppel, tolling, or waiver. *Blumberg v. HCA Management Co.,* 848 F.2d 642, 644 (5th Cir.1988); *Stambaugh v. Kansas Dep't of Corrections,* 844 F.Supp. 1431, 1433 (D.Kan.1994). Plaintiff in the instant case contends that her right-to-sue period, which expired on September 4, 1990, should be tolled until April 6, 1993, the date she filed her complaint. As grounds for the tolling request, plaintiff contends that she never received the right-to-sue letter and that mental incapacity during this period also precluded her from filing suit timely. These contentions will be discussed separately.

### RECEIPT OF THE RIGHT-TO-SUE LETTER

■ The United States Supreme Court has stated that the 90–day filing period in Title VII begins to run on the date the complainant receives the right-to-sue notice, and not when the EEOC issues the notice. In *Espinoza v. Missouri Pacific Railroad Co.,* 754 F.2d 1247, 1250 (5th Cir.1985), the

Fifth Circuit held that "giving notice to the claimant at the address designated by him suffices to start the ninety day period unless claimant, through no fault of his own, failed to receive the right to sue letter, . . . ." Contending that neither she nor her daughter received the EEOC's right-to-sue letter, allegedly mailed on or about May 23, 1990, plaintiff seeks to fit her circumstance under the cloak of the above-enunciated jurisprudence. Alas, she cannot; the reasons are multiple.

Plaintiff avers that she never saw the right-to-sue letter. She testified that no one showed it to her. Yet, what impacts as a blow to plaintiff's credibility, plaintiff's husband testified that he had seen the letter and that plaintiff was the one who showed it to him. He does not remember exactly when she gave him the letter, but he recalls that she additionally told him that Attorney Gilchrist would take her case.

■ Next, several weeks in advance of the mailing of the right-to-sue letter, plaintiff told Dr. Goff that the EEOC had given her permission to sue. Where the EEOC has orally notified a complainant that it found no evidence of discrimination and that her charge had been dismissed, the claimant is not entitled to equitable tolling of the 90–day filing period. *Cook v. Providence Hospital,* 820 F.2d 176, 180 (6th Cir.1987). In *Cook,* the plaintiff admitted to being orally told that her claim had been administratively denied and that she had a right to sue her employer. The EEOC mailed the Notice to Cook, but she denied ever receiving it. The Sixth Circuit held that there was no basis for equitably tolling her right-to-sue period until she received a second letter from the EEOC one year later: "Assuming, *arguendo,* that Cook did not receive the Notice, she *admits that she had actual knowledge, fully one year prior to suit, that the EEOC had given her the right to sue;* yet, she unjustifiably failed to pursue her rights." (Emphasis supplied). *Id.* at 179. *See also McCullough v. CSX Transp. R.R. Co.,* No. 94–3102, 1995 WL 141494, *4, 1995 U.S.Dist. LEXIS 4016, *14 (E.D.Pa.1995) (tolling denied where plaintiff failed to file suit within 90 days after having been orally notified of the adverse EEOC

decision and plaintiff made no attempt to obtain a right-to-sue letter prior to filing suit).

Further, it is undisputed that plaintiff had the assistance of counsel as early as 1990. Dr. Goff's medical records and testimony revealed that plaintiff admitted speaking to Attorney Elizabeth Gilchrist about her claim as early as April 1990. Plaintiff's daughter, Sharon Desselle, admitted taking plaintiff to Attorney Gilchrist's office prior to September 8, 1990, for the purpose of retaining her to assist plaintiff with her claim of discrimination. Ms. Desselle testified that at the initial meeting plaintiff related her complaints regarding mistreatment by her supervisor to Attorney Gilchrist. Even the plaintiff has admitted that she recalls meeting with Attorney Gilchrist in 1990 both with her daughter and with her two sisters, Linda Redd and Hazel Brown.

Then, there is the matter of the averments contained in plaintiff's complaint. Plaintiff has admitted that Attorney Gilchrist drafted the very complaint used to initiate this action. The complaint recites "Thornton has filed a charge of discrimination based on race and retaliation with the EEOC, and has exhausted her administrative remedies."

Then, there is the telling realization that from April, 1990 onward, plaintiff spoke only about a pending lawsuit, not a pending EEOC investigation. Nothing in Dr. Goff's notes show plaintiff yet awaiting an EEOC determination.

So, based on the entire record, this court reaches the conclusion that plaintiff received either oral or written notice, or both, of the EEOC's determination; that as a consequence Attorney Gilchrist was retained by plaintiff's family in 1990 to represent plaintiff in a lawsuit versus South Central Bell and that Attorney Gilchrist knew, or should have known, that a right-to-sue letter had or should have been issued by the EEOC. The collection of facts herein show that from April, 1990 onward, the plaintiff and her attorney evidenced conduct which shows their having received the right-to-sue letter.

## MENTAL INCAPACITY

■ While it is conceivable that mental capacity may toll the statute of limitations in an employment discrimination action, plaintiff in the instant action has not met her burden of proof of showing that equitable tolling is warranted to excuse the two-year and seven-month delay in filing her Title VII action. The case of *Lopez v. Citibank, N.A.,* 808 F.2d 905 (1st Cir.1987), is instructive. In *Lopez,* the First Circuit Court of Appeals addressed the issue of whether the plaintiff's mental incapacity justified an 18-month delay in the filing of a lawsuit where the plaintiff had produced evidence that he was "mentally incapacitated during much or all of the relevant eighteen-month period." *Id.* at 906. The Court noted that there was no "absolute rule" requiring tolling whenever there is a mental disability and emphasized that federal courts " 'have taken a uniformly narrow view of equitable exceptions to Title VII limitations periods.' " *Id.* The Court further noted that "in the federal courts the policy of repose weighs somewhat more heavily than in state courts against the various equitable factors that may, in an individual case, argue for an exemption." *Id.* at 907.

Critical to the First Circuit's analysis was the fact that the plaintiff was "represented by counsel during the period of his illness" and that it seemed "unlikely that appellant's illness deprived his counsel of the knowledge or consent needed to file a court complaint." *Id.* On the contrary, the Court noted that it was "more likely that counsel knew (or should have known) about the relevant limitations period." The Court concluded that absent a "strong reason" for believing that plaintiff's mental illness made him unable to file suit, especially given the assistance of counsel, the statute of limitations should not be tolled. *Id.*

Similar holdings rejecting requests for tolling based on mental incapacity are found in *Decrosta v. Runyon,* Nos. 90–CV–1269 and 90–CV–585, 1993 Wl 117583, *3, 1993 U.S.Dist. LEXIS 5006, *11 (N.D.N.Y. April 14, 1993) (where the plaintiff "could comprehend problems in his employment;" could meet with his attorney to "discuss his concerns and provide information;" the plaintiff demonstrated an "awareness of and conscious deliberation about his legal remedies;" and that plaintiff was critical of his attorney and asked his physician to speak with his attorney); *Char v. Matson Terminals, Inc.,* 817 F.Supp. 850 (D.Hawaii 1992), and *Saccardo v. United States Postal Service,* No. 87–2298–7, 1989 WL 119174, 1990 U.S.Dist. LEXIS 11833 (D.Mass.1989) (where family members were aware of a plaintiff's legal rights and took steps to enforce those rights); *Speiser v. U.S. Dep't of Health and Human Serv.,* 670 F.Supp. 380 (D.D.C.1986) (where plaintiff could only show that her mental illness resulted in "impaired judgment" and did not show that it caused her to be "unable to comprehend her legal rights"); and *Moody v. Bayliner Marine Corp.,* 664 F.Supp. 232 (E.D.N.C.1987) (where the plaintiff had retained counsel before the expiration of the [relevant] filing period).

Based upon the entire record before the court, the court finds that plaintiff's mental capacity did not prevent her and her family from placing her discrimination claim in the hands of an attorney, Elizabeth Gilchrist, in 1990. The plaintiff herself told Dr. Goff as early as April, 1990, that she had spoken with Attorney Gilchrist about the claim. Dr. Goff's medical records show that plaintiff not only mentioned Attorney Gilchrist on several occasions during 1990 (and in 1991 and 1992), but plaintiff understood Attorney Gilchrist to be avidly negotiating a settlement and prepared to see the defendant in court if the negotiations were fruitless. When Attorney Gilchrist became difficult to reach, plaintiff was critical of this unresponsiveness and asked Dr. Goff to contact Attorney Gilchrist on her behalf. From her first meeting with Attorney Gilchrist to her last, plaintiff was capable of describing to her attorney the mistreatment she believed she had received from her supervisor. While Dr. Goff testified that plaintiff showed poor judgment in responding to the inaction and lack of responsiveness by Attorney Gilchrist, Dr. Goff did not state that plaintiff was unable to comprehend her legal rights. Instead, Dr. Goff testified that plaintiff had the mental capacity to comprehend problems in her employment and to articulate those concerns to

others. Dr. Goff confirmed that plaintiff had the mental capacity to express a desire to seek a legal remedy for her perceived mistreatment. So, the sum total of these revealing facts leads this court to conclude that plaintiff "has presented no strong reason why, despite the assistance of counsel, [she] was unable to bring suit in a timely fashion." *Lopez, supra,* at 907. The court finds that, notwithstanding plaintiff's claimed incompetence, plaintiff, with the assistance of Attorney Gilchrist, could have and should have filed suit well in advance of April 6, 1993.[5]

## TOLLING BASED ON ATTORNEY INCOMPETENCE

■ Since the court finds that plaintiff's mental capacity did not preclude her legal counsel from filing a timely suit, the court next must consider whether Attorney Gilchrist's failure to ever file a lawsuit on plaintiff's behalf can operate to invoke equitable tolling of the right-to-sue deadline. The focus here is upon attorney incompetence. In *Edwards v. Kaiser Aluminum & Chem. Sales, Inc.,* 515 F.2d 1195 (5th Cir.1975), the Fifth Circuit affirmed the dismissal of a discrimination action where the employee had not provided a notice of intent to sue within the required 180–day period. The Court stated:

> While it may be inequitable to allow an employer to benefit from its own wrong, it would be at least equally unfair to then hold that the employer is estopped from raising the 180–day bar when the injured employee consulted an attorney who either slept on his client's rights or did not believe he had any under the statute.

*Id.* at 1200, n. 8. *Jackson v. Pala, Inc.,* 621 F.Supp. 1119 (M.D.La.1985) ("oversight" by attorney not sufficient to justify tolling).

In *Irwin v. Dep't of Veterans Affairs,* 498 U.S. 89, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990), the Supreme Court affirmed the dismissal of an employment discrimination suit on the grounds that the complaint was not filed within the specified time period. In rejecting the plaintiff's plea for equitable tolling to apply, the Court concluded:

> Under our system of representative litigation, "each party is deemed bound by the acts of his lawyer-agent and is considered to have 'notice of all facts, notice of which can be charged upon the attorney.'"

*Irwin,* 498 U.S. at 92, 111 S.Ct. at 456, 112 L.Ed.2d at 441. The Court further stated:

> [A]n examination of the cases in which we have applied the equitable tolling doctrine as between private litigants affords petitioner little help. Federal courts have typically extended equitable relief only sparingly. We have allowed equitable tolling in situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass. We have generally been much less forgiving in receiving late filings where the claimant failed to exercise due diligence in preserving his legal rights.

*Irwin,* 498 U.S. at 95, 111 S.Ct. at 457, 112 L.Ed.2d at 444.

Finally, in *Taylor v. Espy,* 816 F.Supp. 1553 (N.D.Ga.1993), the equitable tolling doctrine did not save a federal employee's age discrimination claim where the employee's competency was restored, since plaintiff argues that equitable estoppel tolls her obligation to file a lawsuit during the period of her mental incompetence. However, plaintiff claims she is still mentally incompetent (although the court finds otherwise) and unable to handle her affairs. Further, she says this condition has been continuous. If plaintiff is to be believed and her approach to this case adopted, then on April 6, 1993, plaintiff was yet incompetent and incapable of ratifying the filing of the complaint and, further, is yet incompetent today and incapable of undertaking this lawsuit.

---

5. Even if the court were to choose the last possible date in 1990 (December 31) as the date on which Attorney Gilchrist agreed to handle her suit, suit was not filed still for more than 15 months. In cases where counsel has been appointed, courts have not tolled a filing requirement for more than 30 days after appointment of counsel. *See, e.g., Moshos v. Dist. Council of New York,* 386 F.Supp. 21, 23 (S.D.N.Y.1974) (holding that a delay of nine and one half months after appointment of counsel for filing of complaint could not be excused).

Another point: seemingly, plaintiff's choice of April 6, 1993, would signify the date her mental

attorney simply failed to file suit in a timely manner after receiving the EEOC's denial of that claim. In holding that the attorney's negligence did not invoke the equitable tolling doctrine, the Court stated:

> The failure of Plaintiff's former attorney to file ·suit in a timely manner after he received the EEOC's denial of his client's claim is no such situation [for equitable tolling to· apply]. As Plaintiff acknowledges, the Supreme Court also held in *Irwin,* that: "[u]nder our system of representative litigation, each party is bound by the acts of his lawyer-agent and is considered to have notice of all facts, notice of which can be charged upon the attorney."

*Id.* at 1559. The Court concluded:

> While the Court does not in any way condone the misconduct of Plaintiff's former attorney, Plaintiff's proper remedy is to pursue proper action against her former attorney in state court, as she has done.

*Id.* at 1560.

■ While the plaintiff's circumstances in this case might engender sympathy, the court is guided by the following language from *Baldwin County Welcome Center v. Brown,* 466 U.S. 147, 152, 104 S.Ct. 1723, 1726, 80 L.Ed.2d 196 (1984):

> Procedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out of a vague sympathy for particular litigants.... In the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law.

### SUMMATION

Title VII requires a claimant to file her lawsuit within the 90–day limitation period after receipt of the EEOC's right-to-sue letter. The claimant has the burden of establishing compliance with this condition precedent to filing a lawsuit. The penalty for noncompliance is dismissal of the lawsuit. Plaintiff here sought to dodge this drastic result by arguing non-receipt of the right-to-sue letter and equitable estoppel. Unfortunately for plaintiff, this court upon all of the facts presented is simply unpersuaded by these defenses. Accordingly, this court hereby dismisses this lawsuit with prejudice. A separate judgment shall be entered in accordance with the local rules.

**SO ORDERED AND ADJUDGED.**